**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ALONSO LARA and ELIZABETH LARA,

                    Plaintiffs,

       - against -

DELTA INTERNATIONAL MACHINERY
CORP.,

                  Defendant.
--------------------------------------------------------X

**MEMORANDUM**
**DECISION AND ORDER**

CV 13-6259 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     P<small>RELIMINARY</small> S<small>TATEMENT</small>

       Plaintiffs Alonso Lara and Elizabeth Lara (collectively the "Plaintiffs") brought this

action against the Defendant Delta International Machinery Corp. ("Delta" or the "Defendant")

based upon allegations of negligence, breach of warranty, breach of the implied warranty of

merchantability, strict liability and loss of services in connection with injuries Alonso Lara

sustained while operating a table saw designed and manufactured by Defendant.[1] *See generally*

Complaint ("Compl.") [DE 1].[2] Discovery has closed and Defendant has filed the instant motion

seeking: (1) to preclude the testimony of Plaintiffs' expert Stanley H. Fein; and (2) summary

judgment on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs

---

[1]     Plaintiffs filed their Summons and Verified Complaint in New York State Supreme Court on October 16, 2013. *See* DE 1. Thereafter, on November 13, 2013, Defendant filed a Notice of Removal seeking to remove the pending state court action to federal court. *Id.*

[2]     Plaintiffs initially filed this action against both Delta and Stanley Black & Decker, Inc. However, on January 23, 2015, the parties signed a stipulation which dismissed all claims against Stanley Black & Decker, Inc. *See* DE 29. The Court subsequently "so ordered" the stipulation on February 5, 2015. *See* DE 30. As such, Delta is the sole remaining defendant in this action.

oppose the motion, arguing that genuine issues of material fact preclude summary disposition of any of their claims. Having considered the moving papers, the record evidence, and the applicable law, the Court hereby GRANTS Defendant's motion to preclude Plaintiffs' expert and GRANTS, in part, and DENIES, in part, Defendant's motion for summary judgment.

## II.   <span style="font-variant: small-caps;">Background</span>

The following facts are drawn from Defendants' Rule 56.1(a) Statement of Material Facts, the deposition transcripts, the affidavits submitted in support of and in opposition to Defendants' motion, the declarations of Thomas A. Martin and Edward J. Nitkewicz and the exhibits attached thereto, and the memoranda of law filed in support of and in opposition to the motion. The facts cited are undisputed unless otherwise noted. In considering a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).[3]

---

[3]    Plaintiffs have not submitted the required counter-statement of material facts pursuant to Local Civil Rule 56.1(b). In accordance with Local Civil Rule 56.1(c), where a party fails to specifically controvert facts contained in the movant's 56.1 statement, such uncontroverted facts "will be deemed admitted for purposes of the motion [for summary judgment.]" *See* Local Civil Rule 56.1(c); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir. 2001) ("The facts set forth in a moving party's statement will be deemed to be admitted unless controverted by the opposing party's statement.") (internal quotations and citation omitted). Plaintiffs do not address or otherwise acknowledge the omission of a Rule 56.1 Counterstatement. As such, although a district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules, *see Wight v. Bankamerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000); *Somlyo v. J. Lu–Rob Enters.*, 932 F.2d 1043, 1048 (2d Cir.1991), this does not present such a case. In light of Plaintiffs' failure, the statement of facts contained within Defendant's Rule 56.1 statement shall be deemed admitted for purposes of this motion. Although perhaps a harsh result, the Court is mindful that "[c]reating exceptions to procedural rules will not enhance the ability of the courts to dispense justice, but rather will have the reverse effect . . . [and] a rule which is honored in the breach is no rule at all." *Alexander v. Forest City Pierrepont Assocs*, No. CV 94-3961, 1995 WL 406135, at *2 (E.D.N.Y. June 26, 1995); *see Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S. Ct. 2486, 2497, 65 L. Ed. 2d 532 (1980) ("experience teaches

## A.     Lara's Emigration

Plaintiff Alonso Lara ("Lara"), a legal resident of the United States, emigrated to the United States from his native country of Ecuador.  *See* March 24, 2014 Deposition of Alonso Lara ("Lara Dep.") at 9, attached as Exhibit ("Ex.") G to the May 22, 2015 Declaration of Edward J. Nitkewicz ("Nitkewicz Decl.") [DE 38-1].  Before coming to the United States, Lara was a professor at the Naval Academy in Guayaquil, Ecuador.  Lara Dep. at 9-10.  Although he has resided in the United States for more than 10 years, Lara speaks little English.  *Id*.  While living in Ecuador, although he was employed as a teacher, Lara enjoyed working with his hands and engaged in mechanical and carpentry work as a hobby.  *Id*. at 12.  Upon his arrival in the United States, Lara primarily worked for friends performing electrical and mechanical work on an as-needed basis.  *Id*. at 16-17.

## B.     Lara's Employment with Artplak Studios

In approximately 2010, Lara found employment with Artplak Studios ("Artplak") which is primarily in the business of fabricating plaques, awards or school diplomas from wood or acrylic materials.  *Id*. at 17, 42.  During his employment with Artplak, Plaintiff "did everything,"

---

that strict adherence to the procedural requirements . . . is the best guarantee of evenhanded administration of the law."); *Brockner v. McHugh*, No. 07-CV-703, 2010 WL 5072662, at *2 (W.D.N.Y. Dec. 10, 2010); *Rosario v. Copacabana Night Club, Inc.*, No. 97 CIV. 2052, 1998 WL 273110, at *6 (S.D.N.Y. May 28, 1998); *Mused v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 169 F.R.D. 28, 35 (W.D.N.Y. 1996) (recognizing that where plaintiff "clearly failed to follow the Rules," offered no reasonable justification for such failure and where no exceptional circumstances existed that "would warrant excusal of or mitigate th[e] failure" strict compliance with the relevant procedural rule was necessary).

including cleaning the offices, cutting sheets of metal, wood and acrylic and using a computer-guided laser to cut-out particular designs in acrylic material. *Id*. 24, 41. When he began his employment with Artplak, Lara was instructed by both the owner and manager of Artplak on the proper use of the equipment utilized in the course of Artplak's business. *Id*. at 21-22. This equipment included drills, table saws and polishing machines. *Id*.

One of the primary pieces of equipment which Lara used while employed by Artplak was a Delta 10 inch Tilting Arbor Unisaw ("Delta Unisaw"), a table saw manufactured by Defendant in 1986. *See* April 24, 2014 Deposition of Jeffrey M. Leiman ("Leiman Dep.") at 9-11, attached as Ex. G to the March 9, 2015 Affidavit of Thomas A. Martin in Support of Motion to Exclude Plaintiffs' Expert and for Summary Judgment ("Martin Aff.") [DE 34]; Nitkewicz Decl., Exs. H-J (photographs of the Delta Unisaw in the Artplak workshop). Artplak acquired the Delta Unisaw second-hand during 2008 or 2009. Leiman Dep. at 11. At the time Artplak took possession of the Delta Unisaw, the saw did not include any accessories or written materials. *Id*. Further, by the time Artplak acquired the saw, it no longer had a blade guard or instruction manual and Artplak did not make any attempt to obtain these items. *Id*. at 13-14.[4] Despite the lack of a blade guard or other accessories, the saw was otherwise functional and still contained the riveted warning placard with accompanying safety instructions. Leiman Dep. at 9-10; Martin Aff., Ex. E (photograph of warning placard riveted to the subject Delta Unisaw).

---

[4] Upon shipment from the factory, the Delta Unisaw at issue, Serial Number 86B00576, with a manufacture date of February 1986, contained a splitter mounted blade guard system which conformed to all safety requirements and industry standards in place at the time of manufacture. *See* February 24, 2015 Affidavit of Richard C. Otterbein ("Otterbein Aff."), attached as Ex. I to the Martin Aff. ¶¶ 4, 12. This guard was designed to "articulate in concert with the angular orientation of the saw blade during bevel cutting operations and incorporated a swing away feature whereby it could be rotated away from the blade area and positioned adjacent to the rear portion of the cabinet base for those operations where the blade guard and splitter assembly could not be used." *Id*. ¶ 7.

On beginning his employment at Artplak, Lara received instructions regarding operation of the Delta Unisaw from both Artplak's president Jeffrey Leiman, *see* Leiman Dep. at 5, 24, 57, and Gary Mitchell ("Mitchell"), Artplak's production manager. *See* April 24, 2014 Deposition of Gary Mitchell ("Mitchell Dep.") at 12-14, attached as Ex. H to the Martin Aff. As part of this training, Mitchell advised Lara to always wear protective goggles and to use a "push stick" when feeding material through the saw. Mitchell Dep. at 13. In addition, Lara, as well as other Artplak employees, received periodic safety briefings concerning the use of the saw as well as other pieces of equipment that Artplak used in fabricating its products. *Id*.

Lara used the Delta Unisaw approximately 7 to 12 hours per week to make "straight cuts" through various pieces of material and understood that when using the saw, the spinning blade posed a danger and that body parts should be kept clear of the blade. Lara Dep. at 25-28. Despite the fact that the Delta Unisaw contained a warning placard, Lara stated that he never read it nor did he recall that a warning placard was affixed to the saw. *See* Leiman Dep. at 9-10; Martin Aff., Ex. E (photograph of warning placard riveted to the subject Delta Unisaw); Lara Dep. at 36. Although Lara did use an "apparatus" to assist him in feeding material into the blade of the saw, *id*. at 37, when the piece of material to be cut was of a smaller dimension, Lara stated that he used his hands to guide the material into the saw blade. *Id*. at 54-55. Further, despite the availability of and directive to use "push sticks" when cutting material, Lara could not identify what a "push stick" was, *id*. at 36-37, and stated that other than using the "apparatus," he did not use any other tool to assist him in feeding material into the blade. *Id*. at 47.

## C.    The Accident

On May 22, 2015, Lara arrived at Artplak at approximately eight o'clock in the morning. *Id*. at 48-49.  His primary responsibility for that day was to start work on cutting 40 ten inch by twelve inch pieces of wood into smaller pieces measuring three inches by five inches.  *Id*. at 49-51.  According to Lara, he began the project at approximately ten o'clock in the morning but indicated that the entire job did not necessarily have to be completed all in one day.  *Id*. at 50-52.  Lara stated that he had a goal of completing about 20 pieces that day because he had other responsibilities as well.  *Id*. at 52.  During the completion of this job, Lara pointed out that he would initially feed the wood into the saw using the "apparatus," but that once the pieces got too small, he used his hands instead.  *Id*. at 54-55.  After completing about 10-15 cuts, *id* at 54, a piece of wood Lara was cutting became lodged in the saw blade and then loosened to the point that it dislodged itself from the saw blade and hit Lara in the hand, after which his hand came in contact with the blade of the saw.  *Id*. at 63-64.  As a result of this contact with the spinning saw blade, Lara suffered significant injuries to his hand and was taken to Stony Brook Hospital where emergency surgery was performed.  *Id*. at 67-72.  Lara underwent a total of two to three surgical procedures as well physical therapy.  However, despite all efforts, Lara has only limited use of his injured hand.  *Id*. at 70-71, 76-77.

## III.    DEFENDANT'S MOTION TO PRECLUDE PLAINTIFF'S EXPERT

Delta, in conjunction with its motion for summary judgment, has filed a motion pursuant to Rule 702 of the Federal Rules of Evidence seeking to preclude the testimony of Plaintiff's expert, Stanley H. Fein ("Fein").  *See* Defendant's Notice of Motion to Exclude Expert and for Summary Judgment Pursuant to Fed. R. Evid. 702 and Fed. R. Civ. P. 56 [DE 33].  Defendant

asserts that Fein is "not qualified to render an opinion regarding the subject table saw's design, manufacture or warnings" and, further, that Fein's opinions, which are based upon "mere conclusions and assumptions should be rejected in their entirety." *See* Defendant Delta International Machinery Corp.'s Memorandum of Law in Support of its Motion to Exclude Plaintiff's Expert and for Summary Judgment ("Def's. Mem.") at 1.

When adjudicating a motion for summary judgment, a court may first need to determine the admissibility of expert testimony. *See Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997). Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits submitted in support of and in opposition to a summary judgment motion "set forth such facts as would be admissible in evidence." Therefore, "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," and "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin,* 125 F.3d at 66; *see Sorto-Romero v. Delta Int'l Mach. Corp.*, No. 05-CV-5172, 2007 WL 2816191, at *3 (E.D.N.Y. Sept. 24, 2007). As such, the Court will first consider Delta's motion to exclude Plaintiffs' expert before turning to its motion for summary judgment.

### A.    Admissibility of Expert's Opinion under *Daubert* and Federal Rule 702

#### 1. *General Legal Principles*

The standards governing the admissibility of expert testimony are set forth in Rule 702 of the Federal Rules of Evidence, and are further clarified by the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *See Hilaire v. DeWalt Indus. Tool Co.*, 54   F. Supp. 3d 223, 233-34 (E.D.N.Y. 2014)

Federal Rule of Evidence 702 provides that "[a] witness . . . qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The language used in Rule 702 makes it clear that there are two preconditions which must be satisfied before expert testimony may be admitted into evidence. First, the trial court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical, or specialized in nature. *See Almonte v. Averna Vision & Robotics, Inc.*, No. 11-CV-1088, 2015 WL 5245277, at *6 (W.D.N.Y. Sept. 3, 2015) ("In order for a witness to render opinion testimony at trial, he or she must be 'qualified as an expert by knowledge, skill, experience, training, or education.'") (internal citation omitted); *Hodder v. United States,* 328 F. Supp. 2d 335, 345 (E.D.N.Y. 2004) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)). Second, the trial court must determine that the expert's testimony will assist the trier of fact in understanding the evidence or determining an issue of fact. *See Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir. 2001) (determining whether expert testimony will assist the fact finder "'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue'") (quoting *Daubert*, 509 U.S. at 592–93); *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 176 (N.D.N.Y. 2002) (citing *United States v. 31–33 York Street*, 930 F.2d 139, 141 (2d Cir. 1991) (excluding expert testimony that would only complicate, not assist, the jury's decision on "a simple question for which the jury needed no help")).

In light of the these prerequisites concerning the admissibility of expert testimony, the trial court functions in a "gatekeeping" capacity in order to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597 (explaining that district courts play a gatekeeping function in determining whether the testimony of an expert should be excluded); *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (recognizing that the trial court is tasked with a "gatekeeping role" in determining whether to admit expert testimony); *Hilaire*, 54 F. Supp. 3d at 234 (same); *see also Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 CV 1253, 2010 WL 2674584, at *2–3 (S.D.N.Y. July 6, 2010); *Gould Paper Corp. v. Boise Cascade Corp.*, No. 95 CV 9771, 2000 WL 1099941, at *1 (S.D.N.Y. July 10, 2000). In addition, this gatekeeping function, "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co.*, 526 U.S. at 141, 147, 149-50 (finding *Daubert* applies to the admissibility of an engineering expert's testimony and noting that "[e]ngineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases" and "there are many different kinds of experts, and many different kinds of expertise" to which the *Daubert* analysis applies); *see also Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 321 (N.D.N.Y. 2000) (determining that witnesses were qualified as experts based on their experience as real estate appraisers, as demonstrated by their respective *curriculum vitae* and testimony).

Ultimately, whether expert testimony is admissible at trial is a question of law which rests squarely within the broad discretion of the trial judge. *See Hilaire*, 54 F. Supp. 3d at 234; *Sorto-Romero*, 2007 WL 2816191, at *4; *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir.

2000); *Palazzetti Import/Export, Inc. v. Morson*, No. 98 CV 722, 2001 WL 793322, at *2 (S.D.N.Y. July 13, 2001). Thus, the standards employed by the trial court in making this determination are "liberal and flexible." *Hilaire*, 54 F. Supp. 3d at 234 (quoting *Houlihan v. Marriott Int'l, Inc.*, No. 00 CV 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003)); *see Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 73–74 (N.D.N.Y. 2013) (explaining that to assess "whether a proposed expert is 'qualified,' the trial judge should remember the liberal purpose of Fed. R. Evid. 702, and remain flexibl[e] in evaluating the proposed expert's qualifications") (internal quotations and citations omitted). However, despite such liberality and flexibility, the court's over-arching "gatekeeping" role requires that it "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." *Kumho Tire Co.*, 526 U.S. at 152. As such, where an expert's testimony is "bottomed upon nothing more than mere speculation and guesswork," *see Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475, 2005 WL 387660, at *6 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 Fed. App'x 222, 2005 WL 2759862 (2d Cir. 2005), or otherwise constitutes nothing more than "junk science," *see id.*, "[t]he flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed. . . ." *Amorgianos*, 303 F.3d at 267; *see Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware*, No. 06 CIV 12988, 2009 WL 5173920, at *5 (S.D.N.Y. Dec. 30, 2009) ("The primary purpose of the *Daubert* inquiry is to bar 'junk science' from entering the courtroom."); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 376 (S.D.N.Y. 2014). Therefore, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of

that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *see Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.").

### 2. *Fein's Qualifications to Testify as an Expert*

#### i. Applicable Standards

The Court's first step in considering whether expert testimony will be admitted into evidence requires it to determine whether the proffered expert is qualified by virtue of some specialized "'knowledge, skill, experience, training or education.'" *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed. R. Evid. 702). Although *Daubert* addressed only scientific testimony, it is clear that "any such knowledge might become the subject of expert testimony." *Kumho Tire Co.*, 526 U.S. at 147; *see also McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir. 1992) (finding that proposed expert who lacked relevant training and experience was not qualified to testify as to the adequacy of a warning label); *Cayuga Indian Nation of N.Y.*, 83 F. Supp. 2d at 321. The threshold question is thus "whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Hilaire*, 54 F. Supp. 3d at 235; *see Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd sub nom.*, *Lappe v. Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996) (noting that the expert's skill, knowledge, or experience should be such that the opinion will "*probably* aid the trier of fact in his search for the truth") (emphasis in original).

In the context of a products liability action, "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility." *Lappe*, 857 F. Supp. at 226. Indeed, "[w]here an expert has the education or background to permit him to analyze a given set of circumstances, 'he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture.'" *Id*. (quoting *United States v. Viglia*, 549 F.2d 335 (5th Cir. 1977), *cert. denied*, 434 U.S. 834, 98 S. Ct. 121, 54 L. Ed. 2d 95 (1977); *see Yaccarino v. Motor Coach Indus., Inc.*, No. 03 CV 4527, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006) (recognizing that an expert should not be precluded "from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.") (internal citations omitted); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (finding that district court properly admitted expert testimony of a physician whose specialty area was not identical to the subject matter of the dispute); *Kass v. West Bend Co.*, No. 02-CV-3719, 2004 WL 2475606, at *5 (E.D.N.Y. Nov. 4, 2004) (determining, in a case involving an allegedly defective coffee maker, that an expert was qualified, where, despite having no experience with consumer products, he had sufficient experience in accident prevention); *Zwillinger v. Garfield Slope Hous. Corp.*, No. CV 94-4009, 1998 WL 623589, at *8-9 (E.D.N.Y. Sept. 29, 2006) (in a toxic tort case, admitting as qualified a physician who, though not a certified toxicologist, nonetheless possessed "the minimum educational qualifications necessary to render an expert opinion."). As such, the total scope of an expert's qualifications should be considered in evaluating whether or not his or her testimony is

admissible.  *See Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.,* 929 F.Supp.2d 159, 168 (N.D.N.Y. 2013).

### ii.  Fein's Qualifications

Plaintiffs seek to admit the expert testimony of Stanley H. Fein ("Fein") in support of their claims against Defendant and assert that Fein has the "proper education background or requisite experience to be qualified as a person with specialized knowledge in the field of industrial safety."  *See* Plaintiffs' Alonso Lara and Elizabeth Lara's Memorandum of Law in Opposition to Defendant Delta International Machinery Corp's Motion to Exclude Plaintiffs' Expert and for Summary Judgment ("Pls.' Opp'n") at 23.  Fein graduated from the City College of New York in 1960 with a Bachelor's degree in Mechanical Engineering.  Nitkewicz Decl., Ex. O (Curriculum Vitae of Stanley H. Fein).  He has been a licensed professional engineer in the State of New York since that time.  September 5, 2014 Deposition of Stanley H. Fein ("Fein Dep."), attached as Ex. P to the Nitkewicz Decl. at 11-12.  Following receipt of his Bachelor's degree, Fein pursued a Master's degree in Business Administration at the Bernard M. Baruch School of Business and Public Administration and graduated in 1963.  Nitkewicz Decl., Ex. O.  Thereafter, Fein enrolled in a Master of Engineering program at the City University of New York and graduated with a Master's degree in Engineering in 1969.  *Id.*

From approximately 1960 to 1979, Fein worked as an engineer in various capacities for private and public entities.  *Id.*  These entities included International Radiant Corporation, New York Naval Shipyard, Stone and Webster Engineering Corporation and Long Island College Hospital.  *Id.*  Between 1979 and 1984, Fein was a partner in the engineering firm Brandon Associates Ltd.  *See id.*; Fein Dep. at 29-30.  After leaving the firm in 1984, Fein began to

perform independent work as an engineering consultant. Fein Dep. at 30. As part of his consulting activities, Fein provides litigation consulting services. *Id*. at 16-17. Fein estimates that presently, he spends approximately 25 percent of his time engaged in consulting activities focused on litigation. *Id*. at 17. Since the time Fein began performing litigation consulting work, he has testified at 10 depositions and at 350 trials, mostly in state court. *Id*. at 24. Further, Fein stated that of those 350 trials, only about 10 involved testimony concerning machines under power such as a table saw. *Id*. at 25. Fein explained that in the other 340 trials, he testified with regard to "safety having to do with construction, construction safety, job site construction safety, and safety in buildings . . . [including the] sidewalks . . . stairways . . . lighting systems . . . roofs . . . parapets . . . [and] parking garages." *Id*. When asked about what areas he believed he was qualified to render an expert opinion, Fein stated "[s]afety engineering having to do with buildings, building management and construction and construction safety." *Id*. at 20-21. In addition, from July 2013 to the time of his deposition, Fein stated that he had performed approximately 150 total inspections in conjunction with litigation. *Id*. at 36. However, he clarified that of these 150, only two involved table saws. *Id*.

Fein's Curriculum Vitae identifies nine professional organizations in which he represents he is a member. Nitkewicz Decl., Ex. O. However, during his deposition, Fein stated that he no longer belongs to any of these professional organizations and admitted that the present list enumerated on his Curriculum Vitae is "[i]ncorrect." Fein Dep. at 85-86. Although Fein stated that he had published two articles for the Greater New York Hospital Association Journal in the 1970s, these were not included in his Curriculum Vitae. *Id*. at 86; Nitkewicz Decl., Ex. O. In

addition, other than these two journal articles, Fein stated that since the 1970s, he has not published any scholarly work. Fein Dep. at 87.

Concerning product design, Fein stated that he has never designed a product for use by the general public. Fein Dep. at 21. Although Fein asserted that he designed a laundry conveyor system, grounding system for hospitals, a non-full rail bed design for hospitals and a quartz heater, he does not hold patents for any of these inventions and has never applied for a patent concerning these designs or any other designs. *Id*. at 21-22.

Fein's knowledge and experience, as represented in his Curriculum Vitae and as testified to during his deposition centers on safety engineering concerning buildings and building appurtenances. Fein Dep. 20-21. Fein's experience with the design and manufacture of consumer products — including table saws of the type at issue in this case — is clearly limited. *Id*. at 36. The Court is also cognizant of the fact that Fein is not widely published in scientific journals nor has he designed anything since the 1970s. Further, of those items that he has designed, none have relevance to the table saw at issue in this litigation. Notwithstanding these issues, the Court is also mindful that Fein does possess extensive education in the field of engineering given his Bachelor's and Master's degrees in this field. *See* Nitkewicz Decl., Ex. O. Such education in the field of engineering in general, and mechanical engineering in particular, are sufficient to "permit him to analyze a given set of circumstances, [since] 'he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture.'" *Lappe*, 857 F. Supp. at 226. In this context, the Court also notes Fein's testimony that he has conducted inspections involving table saws.

The Court recognizes that some courts have found an expert unqualified to render an opinion where that expert did not have direct experience with the particular product, machine or specific field at issue in the litigation. *See,e.g.*, *Barban*, 2005 WL 387660, at *4 (precluding expert testimony where purported expert had "never designed a machine of any kind and has never worked with laundry machines in any capacity"); *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 132 (E.D.N.Y. 2009) (finding as unqualified expert who "never provided testimony, conducted studies, authored articles, or performed any other consulting work, specific to ladder design or accidents"); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 183–84 (E.D.N.Y. 2009) (finding expert in drilling accident case not qualified even though he had a B.S. and Master's degree in mechanical engineering, was employed with a forensic firm specializing in mechanical engineering, had taught courses in engineering, but had little expertise in geotechnical field, never operated any drilling rigs and never consulted for a drilling company); *Quintanilla v. Komori Am. Corp.*, No. 04 CV 5227, 2007 WL 1309539, at *4 (E.D.N.Y. May 4, 2007) (finding purported engineering expert unqualified where engineer had no experience with printing presses or design of machine guards, even though he had experience in mechanical design for electronics); *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 750–51, 755 (E.D. Mich. 2000) (finding self-employed "safety consultant" with no graduate degrees, no published articles on forklifts, no leadership position in safety organization, who never designed a product related to forklifts, and had only worked as a forklift operator in a sit down model, not qualified to render opinion).

Notwithstanding such cases, other courts have found that a lack of specific familiarity with a product, machine or specific field does not, in itself, render an expert unqualified to

proffer their opinion. *See, e.g.*, *Hilaire*, 54 F. Supp. 3d at 235 (finding that expert, even though he was not a professional mechanical or electrical engineer, was nevertheless qualified to "opine on questions of the safety elements of a product's design" and that any lack of knowledge or experience with the table saw at issue would go "to the weight of his testimony"); *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 176 (E.D.N.Y. 2008) (finding that although the expert had no experience or education relating to the analysis of hand saws, he was qualified to render an opinion regarding the guarding mechanism on a saw by virtue of his Bachelor's Degree and Master's Degree in mechanical engineering and his Ph.D in Engineering Science, and his experience as an engineering consultant, which included designing various items, including guards on a stationary punch press and hand exerciser and noting that "the expert's lack of experience with saws goes to the weight of his testimony, not its admissibility"); *Peretz v. Home Depot, Inc.*, 08 CV 4106, 2009 WL 3124760, at *2–3 (E.D.N.Y. Sept. 29, 2009) (finding expert "to be sufficiently qualified to offer his opinion as an expert, albeit barely" regarding the guard in a grinder, even though he had not studied mechanical engineering, had limited knowledge of standards and never designed a grinder); *see also Yaccarino v. Motor Coach Indus., Inc.*, 2006 WL 5230033, at *9.

In the instant case, Fein may not be a leading expert in consumer / industrial product safety and design. However, the Court is required at this first stage to evaluate the totality of Fein's qualifications to ensure that his knowledge of the subject matter "will likely assist the trier of fact." *See Hilaire*, 54 F. Supp. 3d at 235-36. As such, given Fein's overall background, education, training and prior experience in the field of engineering generally, the Court "concludes that he is qualified . . . to testify in this case, and his lack of knowledge and

17

experience goes to the weight of his testimony." *Id*. at 242. *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (finding expert's alleged shortcomings in academic training in fume dispersal and lack of specific knowledge about the chemical constituents of the fumes, should be explored on cross-examination); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 461 (S.D.N.Y. 2010) (finding that while the expert "may not be the world's leading expert" in the relevant field, plaintiffs' arguments regarding his qualifications went to the weight and credibility of the testimony); *Emig v. Electrolux Home Prods. Inc.*, No. 06 CV 4791, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) (finding the expert's lack of a post-graduate degree in engineering and absence of experience in a particular area of consumer products went to the weight of the testimony).

### 3. *Reliability of Fein's Proposed Testimony*

#### i. Applicable Standards

Having found that Fein is qualified to render an expert opinion in this case based upon the totality of his background, the Court turns its focus to "the question of whether the expert's testimony is reliable and will be of assistance to the trier of fact in evaluating the evidence." *Hilaire*, 54 F. Supp. 3d at 242. In determining the reliability of the reasoning and methodology underlying an expert's testimony, the Court is guided by the standards set forth in *Daubert* which requires the Court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113. Among the factors to be evaluated by a court in its determination are: (1) the ability to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and

18

publication; (3) its potential rate of error; and finally, (4) its general acceptance in the relevant scientific community. *See id.* at 592–94; *see also Iacobelli Constr. Inc. v. Cty. of Monroe,* 32 F.3d 19, 25 (2d Cir. 1994); *Amorgianos*, 303 F.3d at 265-66; *Hilaire*, 54 F. Supp. 3d at 242; ; *Sorto-Romero*, 2007 WL 2816191, at \*4.  Notwithstanding the use of these factors in determining an expert's reliability, they are not meant as a "definitive checklist or test . . . [since] [t]he inquiry envisioned by Rule 702 . . . is a flexible one and the gatekeeping inquiry must be tied to the facts of a particular case." *Amorgianos*, 303 F.3d at 266 (internal quotations and citations omitted); *see Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2d Cir, 2004) (recognizing that the list of factors set forth in *Daubert* "neither necessarily nor exclusively applies to all experts or in every case"); *Hilaire*, 54 F. Supp. 3d at 243 (noting that "any inquiry into reliability need not be limited to the four factors listed in *Daubert* [since] these guidelines must be applied with flexibility, particularly when the expert is offering opinions based on specialized personal knowledge rather than scientific studies"); *Borgognone v. Trump Plaza*, No. 98-CV-6139, 2000 WL 341135, at \*3 (E.D.N.Y. Mar. 9, 2000) (same).  In addition, pursuant to the Supreme Court's decision in *Kumho*, it is undisputed that "regardless of an expert's experience and his expertise, the court must still perform its gatekeeping function and examine the methodology used by the expert in reaching his opinion in order to determine if it is 'reliable' and will assist the jury." *Hilaire*, 54 F. Supp. 3d at 243 (citing *Kumho Tire Co., Ltd.*, 526 U.S. at 149).

Despite the flexible inquiry required under *Daubert* and its progeny, and in order to uphold its gatekeeping function, a court should exclude expert testimony where it is "speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to

suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotations and citations omitted); *Hilaire*, 54 F. Supp. 3d at 243; *Delehanty*, 663 F. Supp. 2d at 132. Where an expert's testimony is "connected to existing data only by the ipse dixit of the expert[,] [a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *see Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S. 826, 113 S. Ct. 84, 121 L. Ed. 2d 47 (1992); *Peretz*, 2009 WL 3124760, at *1; *Sorto-Romero*, 2007 WL 2816191, at *5.

The burden of establishing the reliability of an expert's theories pursuant to the standards set forth in Federal Rule 702 and *Daubert* falls squarely with the proponent, who must establish reliability by a preponderance of the evidence. *Hollman v. Taser Int'l. Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013) (citing *Daubert*, 509 U.S. at 592, n. 10); *see Hilaire*, 54 F. Supp. 3d at 243-44.

### ii. Fein's Proposed Testimony

Fein conducted a brief inspection of the Delta Unisaw at issue in this case at Artplak on July 15, 2013. Fein Dep. at 6. Although he could not recall the precise amount of time spent conducting this on-site investigation, Fein estimated that he inspected the saw for approximately 1 hour. *Id*. During the inspection, Fein did not attempt to ascertain when the Delta Unisaw was manufactured and stated that such information was not relevant in arriving at his conclusions. *Id*. at 8. Fein did opine that the Delta Unisaw met all applicable standards promulgated by the American National Standards Institute ("ANSI"). *Id*. at 26. However, despite arriving at this

conclusion, Fein stated he could not recall what the standard was and that, in any event, he arrived at this determination without conducting a specific inquiry regarding the particular saw at issue. *Id*. Further, as part of his investigation, Fein stated that he did not consult with anyone else in arriving at his overall conclusions and did not perform any tests. When asked whether he operated the model saw at issue in this case, he stated "I don't know." *Id*. at 88-89. Significantly, Fein could not even recall conducting this inspection or authoring his initial report in this case. *Id*. at 37, 47-48. After Fein completed the on-site inspection, he reviewed three depositions and the owner's manual provided by the Defendant. However, Fein's review of these materials did not take place until a few months prior to Fein's deposition which occurred over a year after his initial inspection was conducted and his report issued. *Id*. at 37-38.

Despite Fein's lack of recall, he did author two reports in conjunction with this inspection — an initial report written in July 2013 and a supplemental report in July 2014. *See* Nitkewicz Decl., Ex. B (Initial Inspection Report of Stanley H. Fein, dated July 29, 2013); Ex. Q (Supplemental Inspection Report of Stanley H. Fein, dated July 29, 2014).[5] Fein's report is a

---

[5]    The Court will only consider Fein's initial report in light of the fact that the supplemental report was not created or based upon Fein's inspection of the Delta Unisaw but rather was authored merely because the instant litigation was proceeding in a federal versus a state forum. The supplemental report has no relationship to Fein's theory or findings and, as such, is not relevant. As Fein himself stated:

> [M]y feeling of the safety of the saw has to do with the blade guard right? Now, I'm aware that this is a case that's going to federal court, and you can't talk about anything that you haven't said in your report, so what I did is realizing that I've adopted the report, I've added on those two items in the report so that you would have the opportunity to cross-examine me regarding my knowledge of those two items so I wouldn't be stopped from using it. That's all. *I just refined the report because it was . . . federal court. If it was not federal court, I would have left the original report and not changed it.* (emphasis added).

scant two pages in length, with five photographs appended to it. Nitkewicz Decl., Ex. B. The "Investigation" portion of the report consists of two paragraphs. *Id.* The first paragraph describes the Delta Unisaw, states that the saw did not have a guard, and opines that "[g]ood and accepted engineering safety practice would require that there be a guard in place at all times during the operation of the machine." *Id.* The final paragraph concludes with Fein's opinion that the Defendant was negligent in not manufacturing a saw with an irremovable guard or interlock mechanism which would prevent the machine from being operated when the guard is removed. *Id.*

During his deposition, Fein reiterated the conclusion reached in his report that the removable guard and lack of an interlock device were the cause of Lara's injuries. He testified that:

> Q:    The truth of the matter is the defect in this saw, as you see it, is the fact that the guard can be removed and the saw still operated, correct?
>
> A:    Correct.
>
> Q:    And that's the –
>
> A:    Bottom line, we could have saved six or seven hours.
>
> Q:    Right. That's the defect that you intend to testify [to] and none other.
>
> A:    That's correct.
>
> Q:    The primary basis for the opinion you intend to express, if not the only basis, is your inspection of the saw and the fact that it can be used without the guard present, correct?
>
> A:    Correct.

In addition, where, as here, an expert's supplemental report contains new theories of liability not addressed in the initial report, courts have deemed such reports unduly prejudicial and subject to preclusion. *See Lent v. Signature Truck Sys., Inc.*, No. 06-CV-5698, 2011 WL 4575312, at *3 (W.D.N.Y. Sept. 30, 2011).

Q:      You reviewed deposition transcripts?

A:      Right.

Q:      And documents and the owner's manual, but at the end of the day, just inspecting the saw and seeing that it could be operated without the guard was enough for you?

A:      I didn't even have to see the saw.

Q:      All right.  In essence, to express your opinion, you didn't have to see all these other documents, you could have just said if you can operate the saw without the guard, that's enough for me, it's defective?

A:      That's it.

Q:      No matter when it was manufactured?

A:      That's it.

Fein Dep. at 90-91.  In addition, when Fein was asked how such an interlock mechanism could be designed for this particular application, he stated that "I'm not a designer.  I'm only a safety engineer" and that, in any event, he had not given such a design "much thought," nor had he tested such a design on any table saw.  *Id*. at 60, 69-70.  Further, Fein opined that "[t]he saw should be designed to protect [the user] from *all* possible hazards" and that in his opinion "the operator could *never* contribute [to any injuries sustained]."  *Id*. at 51 (emphasis added).

Although conceding that no tests were performed on the saw and that neither the subject saw nor any comparable saw was operated as part of the investigation, Fein maintained his position that the fact that the saw can be operated without a guard in place was the cause of Lara's injuries and that "[t]here is nothing that . . . anybody else can do to change my mind on that."  *Id*. at 83, 90.

### iii. Reliability of Fein's Opinion

In a products liability action, "the 'touchstone' of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Hilaire*, 54 F. Supp. 3d at 244; *see Barban*, 2005 WL 387660, at *5. This utility versus cost comparison should entail the testing of any proposed alternative design. *See Smith v. Herman Miller, Inc.*, No. 03 CV 5358, 2005 WL 2076570, at *4 (E.D.N.Y. Aug. 26, 2005); *Kass v. West Bend Co.*, No. 02 CV 3719, 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004); *Sorto-Romero*, 2007 WL 2816191, at *7 ("In analyzing the reliability of an expert's testimony, the key question is whether it can be (and has been) tested). Indeed, "[t]he presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 77 (S.D.N.Y. 2001); *see Sorto-Romero*, 2007 WL 2816191, at *7. Thus an expert's "failure to test a theory . . . can justify a trial court's exclusion of the expert's testimony." *Brooks v. Outboard Marin Corp.*, 234 F.3d 89, 92 (2d Cir. 2000).

In the instant case, Fein's ultimate opinion rests upon the premise that the Delta Unisaw could be operated without a guard and that such a design is thus inherently defective. *See* Nitkewicz Decl., Ex. B; Fein Dep. at 90. However, other than espousing this conclusory assertion, Fein admitted that neither prior to nor during the investigation of this case did he perform any tests regarding an alternative design which included an interlock device. Fein Dep. 69-70, 88. Indeed, other than some theoretical musings made during his deposition as to how such a design could be accomplished, *see id*. at 60-61, Fein conceded that he is "not [a] designer"

24

but is "only [a] safety engineer" and that he has never actually designed such an interlock system for use in a table saw. *Id*. Having performed not a single test in this case and surmising that he "didn't even have to see the saw" to render his opinion, Fein nevertheless confidently asserts — to the exclusion of any other information that could possibly bear on the issue — that because the Delta Unisaw could be operated without a guard, it is defective. *Id*. at 91. Further, although conceding that there exist certain cuts that cannot be made with the guard in place, thus impacting the saw's utility, Fein concludes that a user should simply "use a different machine."[6] *Id*. at 51-52.

Without properly testing his alternative theory, Fein's ultimate conclusions are "bottomed upon nothing more than mere speculation and guesswork," which are a less than adequate basis to support Fein's position — especially since performing detailed studies and tests represents the "touchstone of what an engineering expert in a design defect case should do." *Barban*, 2005 WL 387660, at *6; *Hilaire*, 54 F. Supp. 3d at 244. In short, having performed no meaningful tests or calculations, having prepared no drawings of any such proposed design alternative or otherwise having conducted any meaningful comparison of the cost versus utility of an alternative design theory, there is little question that Fein's theories and conclusions are supported only by his thin assertions which themselves amount to little more than speculation and conjecture. Such a foundation falls far short of meeting the standards outlined in *Daubert* and Rule 702. As such,

---

[6] Although not the ultimate premise upon which Fein bases his conclusions, "a plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used." *Hilaire*, 54 F. Supp. 3d at 248-49; *see Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (holding that "an allegation that [defendant] could have manufactured a different product altogether, or that others have done so, does not itself make out a plausible claim of design defect"); *Pinello v. Andreas Stihl AG & Co. KG*, No. 08 CV 425, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011) (holding that plaintiff's contention that an "entirely different product" could have been used did not create a dispute of material fact as to whether there was an alternative design).

the Court rejects Fein's theories and conclusions as being unreliable. On that basis, the Court

has little choice but to preclude his testimony. Indeed, an expert's failure to perform proper tests

or otherwise engage in any meaningful steps that would establish professional rigor in the

assessment of a proposed alternative design has proven fatal in similar cases. *See e.g.*, *Zaremba*

*v. General Motors Corp.*, 360 F.3d 355 (2d Cir. 2004) (precluding testimony of biomechanical

engineer concerning a safer alternative design of a vehicle involved in a rollover accident,

finding that his opinion as to the design was speculative and unreliable because he failed to

prepare alternative design drawings, performed no calculations, had not tested the design or

subjected it to peer review and had not shown general acceptance of the design or methodology);

*Sorto–Romero*, 2007 WL 2816191, at *5 (excluding expert's testimony regarding a wood shaper

guard where the expert never owned or used a wood shaper, had no opinion as to whether an

interlock would be feasible, never designed one for a wood shaper and conceded that the existing

guard complied with ANSI standards); *Brooks*, 234 F.3d at 92 (precluding expert from testifying

that a kill switch should have been installed on the engine of a motorboat, finding the testimony

unreliable and speculative because the expert had not done any actual testing, never saw the boat,

never spoke to the people involved in the accident to attempt to reconstruct the accident, and had

failed to perform any tests as to his theory of causation); *Delehanty*, 663 F. Supp. 2d at 133

(prohibiting expert testimony where expert's initial inspection of ladder was conducted three

months after the accident, expert had no idea as to ladder's condition at the time of the accident

and otherwise "offered no research demonstrating that ladders with stainless steel bolts are

safer"); *Barban*, 2005 WL 387660, at *5 ("Fein's failure to test his proposed alternative, to

determine its impact, if any, on the machine's utility . . . drives the Court to exclude evidence [of

his proposed theory]."); *Hilaire*, 54 F. Supp. 3d at 247 (excluding expert's opinion where it lacked any scientific or technological basis and where expert neither designed an interlock device for a table saw nor conducted any studies to determine feasibility of such an design alternative); *Kass*, 2004 WL 2475606, at *6 (holding that "courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested for safety or utility").

Apart from Fein's failure to perform even the barest of scientific inquires, the Court is also troubled by Fein's sweeping conclusion that there is no set of circumstances where a machine's operator is ever at fault — either partially or completely — for injuries sustained through the operator's use of a machine. *See* Fein Dep. at 51 (noting that in Fein's opinion "the operator could never contribute [to his injuries] and that the saw should be designed "to protect [the operator] from *all* possible hazards") (emphasis added); 62 ("I feel that . . . there is *never* any contribution on the part of the worker") (emphasis added). This conclusion is in clear derogation of the "well-established principle in tort law that a manufacturer is not an insurer against injury, nor must the product be accident proof." *Barban*, 2005 WL 387660, at *6. As such, "[t]hat startling view also drives the Court to conclude, that without anything more and based only upon the fact that Plaintiff was injured, [the expert] is predisposed to the view that the machine was the cause. It was precisely that pretense of expertise, characterized as 'junk science,' at which *Daubert* was aimed." *Id*. The reasoning of *Barban* is apt here. Fein's testimony is unsupported and unreliable. These circumstances are well beyond the issue of weight to be ascribed to Fein's testimony — they go directly to its admissibility in the first

instance. For these reasons, the Court cannot consider his opinion in rendering a decision with respect to Defendant's underlying motion for summary judgment.

In light of the foregoing factors, Defendant's motion to preclude Plaintiffs' expert testimony is GRANTED.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09 Civ. 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of*

*Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor.").  Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

The Court need only consider admissible evidence when adjudicating a motion for summary judgment.  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *Hilaire*, 54 F. Supp. 3d at 251.  Therefore, it follows that "the trial court should not consider testimony of an expert it has found to be unreliable in evaluating a motion for summary judgment."  *Id.*; *see Nora Beverages*, 164 F.3d at 746. Further, in this diversity action, New York law governs all issues presented by the motion for summary judgment. *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir.1997) (applying New York law to products liability action against out-of-state defendants); *see Lent*, 2011 WL 4575312, at *7 n. 8.  With the foregoing principles in mind, the Court turns to an analysis of Defendant's motion.

## B. Negligence and Strict Liability Claims

Plaintiffs have interposed claims based upon theories of negligence and strict liability. Under New York law, a Plaintiff's claim based upon an alleged design defect, sounding in either negligence or strict liability, requires the same *prima facie* evidentiary showing. *See Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 415-16 (N.D.N.Y. 2012); *see Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62-63 (2d Cir. 2002) (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735 (1995)) ("In general, . . . the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing" (internal citation omitted)).  Further, it is well-settled law that "'[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.'" *Estrada v. Berkel Inc.*, 14 A.D.3d 529, 530, 789 N.Y.S.2d 172 (App. Div. 2005) (internal citation omitted); *see Monell*, 895 F. Supp. 2d at 416; *Sorto–Romero*, 2007 WL 2816191, at *11; *Savage v. Beiersdorf Inc.*, No. 13–CV–0696, 2013 WL 5532756, at *5 (S.D.N.Y. Sept. 30, 2013) ("[F]ailure to warn claims are identical under strict liability and negligence theories of recovery.").  As New York treats any difference between a negligence theory and strict liability theory as "inconsequential," *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 437 (E.D.N.Y. 2013) *aff'd*, 559 F. App'x 11 (2d Cir. 2014) (quoting *Saladino v. Stewart & Stevenson Servs., Inc.*, No. 01 Civ. 7644, 2007 WL 4285377, at *5 (E.D.N.Y. Dec. 3, 2007), the Court will analyze these claims together.  *See Saladino*, 2007 WL 4285377, at *4; *Barban*, 2005 WL 387660, at *7; *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 164-65 (S.D.N.Y. 2003); *G .E. Capital Corp. v. A.O. Smith Corp.*, No. 01 Civ. 1849, 2003 WL 21498901, at *4 (S.D.N.Y.

July 1, 2003) (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 60 (S.D.N.Y. 2001)).

Applying New York law, there are four separate theories under which a plaintiff may pursue a recovery based upon a claim of products liability: (1) strict liability; (2) negligence; (3) express warranty and implied warranty. *Hilaire*, 54 F. Supp. 3d at 252; *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106-07, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207, (1983). In order to establish a *prima facie* case with regard to any of these four theories, the plaintiff must show that the product at issue was defective and that the defectively designed product was the actual and proximate cause of the plaintiff's injury. *Voss*, 59 N.Y.2d at 107–09, 463 N.Y.S.2d at 402–03, 450 N.E.2d at 208–09; *see* 89 N.Y. Jur. 2d Products Liability § 2.

There are three types of defects recognized under New York law: (1) design defects; (2) manufacturing defects; and (3) defective or inadequate warnings. *Voss*, 59 N.Y.2d at 106, 463 N.Y.S.2d at 401, 450 N.E.2d at 207; *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir.1997). In this case, Plaintiffs claim that design defects and a failure to provide adequate warnings caused Alonso Lara's injuries.

### 1. *Defective Design*

"A defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." *Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520, 522, 717 N.E.2d 679, 681 (1999) (internal quotation omitted). In a strict liability claim for defective design, Plaintiff must show: (1) the product as

designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing Plaintiff's injury. *See Barban*, 2005 WL 387660, at *7; *Lent*, 2011 WL 4575312, at *2; *Delehanty*, 663 F. Supp. 2d at 133; *Voss,* 59 N.Y.2d at 107; *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134-35 (2d Cir.1999).

In order to prove liability grounded upon a design defect, New York law requires plaintiffs to proffer expert testimony as to the feasibility and efficacy of alternative designs. *See Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898, 2009 WL 3334364, at *6 (collecting cases); *Frazer v. ITW Food Equip. Grp. LLC*, No. 11 CV 9699, 2013 WL 6164486, at *5 (S.D.N.Y. Nov. 22, 2013) (explaining that "[a] party cannot survive summary judgment on a design defect claim without admissible expert testimony"); *Hilaire*, 54 F. Supp. 3d at 252; *Sorto–Romero*, 2007 WL 2816191, at *10 (noting that "Plaintiff's design defect claim cannot proceed without expert testimony. . . .").

In the instant case, the Court has found that Plaintiffs' proffered expert is not qualified to render an expert opinion as to whether the design of the Delta Unisaw was in fact defective and whether an alternative design would have enabled Lara to avoid injury. In addition, Plaintiffs have not submitted the opinion of an alternative expert in support of their claims.  Without presenting the testimony from a person with the requisite technical and scientific knowledge beyond the ken of the average layperson, under New York law, Plaintiffs will be unable to sustain their burden of proving that the Delta Unisaw was, in fact, defective.  In light of this lack of evidence, no genuine issue of material fact exists and Plaintiffs' claims based upon a theory of

a design defect must fail as a matter of law. *See Hilaire*, 54 F. Supp. 3d at 252; *Sorto–Romero*, 2007 WL 2816191, at *10; *Delehanty*, 663 F. Supp. 2d at 134.

Moreover, even if Plaintiffs' expert was qualified to render his opinion as to the saw's alleged defective design, the Court points out that his proffered theory — grounded upon the fact that the saw could be operated without the blade guard in place and should have had an interlock device to prevent such operation, *see* Fein Dep. 59-62, 69-70, 90-91 — has been both explicitly and implicitly rejected as a matter of law. *See Chavez v. Delta Int'l Mach. Corp.*, 130 A.D.3d 667, 669, 13 N.Y.S.3d 482, 485 (App. Div. 2015) ("An interlock on a table saw, which would prevent the operation of the table saw without the guard in place, could make the table saw unusable for certain cuts, thereby impairing its functionality . . . [t]herefore, a theory of liability based upon an allegation that a table saw should have been designed with an interlock has been 'explicitly rejected as a matter of law.') (internal citation omitted); *David v. Makita, U.S.A.*, 233 A.D.2d 145, 649 N.Y.S.2d 149 (App. Div. 1996); *Banks v. Makita, U.S.A.*, 226 A.D.2d 659, 641 N.Y.S.2d 875 (App. Div. 1996)." *Giunta v. Delta Intern. Machinery*, 300 A.D.2d 350, 751 N.Y.S.2d 512, 514 (App. Div. 2002) (theory of liability rejected where plaintiffs' expert testified that the table saw should have been designed with an interlock which would have prevented the motor from starting if the blade guard was off); *Patino v. Lockformer Co., Inc.*, 303 A.D.2d 731, 757 N.Y.S.2d 107, 109 (App. Div. 2002) ("Despite the plaintiffs' assertion to the contrary, the absence of an interlock device is an insufficient theory of liability as a matter of law." (citing *Giunta*, 751 N.Y.S.2d at 512)).  As such, there is no genuine issue of material fact for a jury to consider regarding such a theory.  Thus, Plainitffs' design defect claim fails on this basis alone.

### 2. *Failure to Warn*

In addition to the theory of liability predicated upon a defective design, Plaintiffs also seek recovery based upon a theory of failure to warn. Pursuant to New York law, "a plaintiff may assert that a product is defective because the manufacturer failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product." *Sorto–Romero*, 2007 WL 2816191, at *11 (citing *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 365-66 (2d Cir. 1997); *see Hilaire*, 54 F. Supp. 3d at 253 (citing *Voss*, 59 N.Y.2d at 107, 463 N.Y.S.2d at 401, 450 N.E.2d at 207). Consequently, a defendant will be found liable based upon a failure to warn theory where the duty to warn was breached and that failure constituted a substantial or proximate cause of the ensuing injury. *See Burke v. Spurtanics, Ltd.*, 252 F.3d 131, 139 (2d Cir. 2001) (internal quotations omitted); *Billsborrow v. Dow Chem.*, 177 A.D.2d 7, 579 N.Y.S.2d 728, 733 (App. Div. 1992). However, "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger." *Burke*, 252 F.3d at 139; *see Baptiste v. Northfield Foundry & Machine*, 184 A.D.2d 841, 584 N.Y.S.2d 221, 223 (1992) (defendants had no duty to warn of the specific danger of using a table saw without a guard, when the plaintiff had used the table saw for years, knew of another employee being injured on a table saw, and had attended a meeting where employees were told never to remove safety guards). Thus, it follows that an act "cannot be the [proximate] or 'substantial cause' if the injury would have occurred regardless of the content of a defendant's warning." *Sorto–Romero*, 2007 WL 2816191, at *11 (citing *Figueroa v. Boston Scientific Corp.*, 254 F.

Supp. 2d 361, 370 (S.D.N.Y. 2003)); *Mustafa v. Halkin Tool, Ltd.*, No. 00-CV-4851, 2007 WL 959704, at *18 (E.D.N.Y. Mar. 29, 2007) ("An act cannot be the 'substantial cause' if the injury would have occurred regardless of the content of defendant's warning.").

The sufficiency of a warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment. *See Urena*, 114 F.3d at 366 (applying New York law); *Anderson v. Bungee Int'l Mfg. Corp.*, 44 F. Supp. 2d 534, 539 (S.D.N.Y. 1999); *Mustafa*, 2007 WL 959704, at *17 ("whether warnings were adequate to deter potential misuse and whether the alleged failure to warn was a substantial or proximate cause of the injury is ordinarily a question for the jury"); *Howard v. Poseidon Pools*, 72 N.Y.2d 972, 974, 534 N.Y.S.2d 360, 361, 530 N.E.2d 1280 (1988); *Johnson v. Johnson Chem. Co.*, 183 A.D.2d 64, 69, 588 N.Y.S.2d 607, 609 (App. Div. 1992). Nonetheless, a plaintiff has the burden of proving that the absence of an adequate warning proximately caused his injury. *Anderson*, 44 F. Supp. 2d at 539; *Belling v. Haugh's Pools, Ltd.*, 126 A.D.2d 958, 959, 511 N.Y.S.2d 732, 733 (App. Div. 1987).

In the instant case, Lara acknowledged that he speaks some English, but stated that he could not read English. *See* Lara Dep. at 10. Both the written warning contained on the riveted placard affixed to the saw as well as the instruction manual itself were written only in English. *See* Martin Aff., Ex. D (copy of the Delta Unisaw owner's manual); Ex. E (photograph of warning placard riveted to the subject Delta Unisaw). As such, Lara could not have read either the warning or the instruction manual (had the manual been available) and his actions would therefore not have changed no matter what the content of the warning message or its location on the saw. As such, the accident would have occurred in any event. Consequently, there is no

material question of fact whether a failure to warn was a substantial factor in Lara's injuries. *See Sorto–Romero*, 2007 WL 2816191, at *11; *Mustafa*, 2007 WL 959704, at *19 ("The fact that the warnings were in English, a language [plaintiff] was unable to read or understand at the time of the accident, severs the causal connection between the alleged inadequacy of the warning and the accident."); *see Gonzalez by Gonzalez v. Morflo Industrs., Inc.*, 931 F. Supp. 159, 168 (E.D.N.Y.1996) ("where a warning would not have increased the particular injured user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of the accident" (citing *Kerr v. Koemm*, 557 F. Supp. 283, 286 (S.D.N.Y.1983)).

The Court acknowledges that there is some authority for the proposition that where a plaintiff failed to read product warnings, he may still prove causation if he can demonstrate either that he would have read the warning had it been more prominent or conspicuously placed, *Johnson*, 183 A.D.2d at 70-72, 588 N.Y.S.2d at 610-12, or that he would have been unable to understand the warning had he read it, *Arbaiza v. Delta Int'l Mach. Corp.*, No. 96-1224, 1998 WL 846773, at *7 (E.D.N.Y. Oct.5, 1998). However, plaintiffs in these referenced cases interposed factual issues concerning whether the prominence, placement, clarity and/or content of the warning foreclosed them from reading it, thus establishing that the inadequacy of the warning was causally connected to their injury. Here, Lara has not asserted that he would have read the warning if it had been printed in Spanish, or had been posted in a larger font or had been located in a different place. Indeed, the fact that the warnings were in English — a language Lara was unable to read or fully understand at the time of the accident — terminates any possible causal connection between the alleged inadequacy of the warning and the accident and, as such, his failure to warn claim fails as a matter of law. *See Mustafa*, 2007 WL 959704, at *19

(granting summary judgment on products liability claim predicated on failure to warn theory where plaintiff, who was Albanian and could not read English, did not interpose any facts alleging that he would have read the warning had it been written in Albanian, written in a larger font or located in a more conspicuous place).

Notwithstanding the above factors, a plaintiff seeking to recover based upon a failure-to-warn theory "may be able to prevail under New York law . . . even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party, such as fellow workers or an employer, and they would have informed him of those warnings." *Humphrey*, 556 F. Supp. 2d at 181; *see,e.g*, *Sorto-Romero*, 2007 WL 2816191 at \*12 ("[I]n light of Plaintiff's inability to read the warnings, Plaintiff may be able to prove causation whereby a third party may have conveyed the warning to him.") (citing N.Y. cases); *Mustafa*, 2007 WL 959704 at \*19 (Plaintiff "could prove the requisite ca[usa]l link in light of his inability to read the warning . . . under a theory of causation whereby [a] third party may have conveyed the warning to him."); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 570 (S.D.N.Y. 2005) ("the 'realities of society'- i.e., the realties of the mountain biking community-might have resulted in Plaintiffs friends advising him not to use a Y5 model for jumping, even if Plaintiff had not read the warning himself"); *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 445 n. 24 (S.D.N.Y. 1999) (a witness who felt concerned about plaintiff's use of a trampoline but did not say anything might have voiced her concern had adequate warnings accompanied the product); *Power v. Crown Controls Corp.*, 149 Misc. 2d 967, 970, 568 N.Y.S.2d 674, 676 (Sup. Ct. 1990) ("[I]f a proper warning had been given, it could have

come to the attention of officials of plaintiffs employer or perhaps even fellow workers, who could have informed plaintiff of what he had not personally read.").

In this case, Lara testified that he spoke some English. *See* Lara Dep. at 10. In addition, the record establishes that Lara received instructions from both Leiman and Mitchell concerning operation of the saw and safety precautions to be taken while using the saw. Martin Decl. Ex. H at 12-14; Ex. G at 57-61. Further, Mitchell, Artplak's Production Manager, stated that he had no issue communicating with Lara since he spoke some Spanish and that in any event other Artplak employees spoke Spanish. As such, if he or Leiman were unsure that Lara understood something they would use one of their employees as an interpreter — specifically identifying a female employee named "Rosario" as someone who would act in such a capacity. *See* Martin Decl. Ex. H at 15. In light of the possibility that adequate warnings could have come to the attention of either Mitchell, Leiman or other Artplak employees who worked with the saw makes it feasible that they would have in turn conveyed such warnings to Lara — a factor which could permit a jury to find the requisite causal link necessary for Lara to sustain a claim of products liability based upon a failure to warn theory. *See Humphrey*, 556 F. Supp. 2d at 181 (recognizing that question of fact existed as to whether additional warnings would have been relayed to plaintiff and concluding that "whether [plaintiff's] employer or co-workers would have conveyed to him any additional warnings that plaintiff claims should have been utilized to make the warnings adequate, cannot be decided under the circumstances of this case as a matter of law on summary judgment, but rather need to be submitted to a jury."); *Aponte v. Illinois Tool Works, Inc.*, No. 06-CV-06394, 2009 WL 3837310, at *5 (E.D.N.Y. Nov. 17, 2009) ("even assuming that [plaintiff] would not have read an adequate warning, whether [plaintiff's] coworkers or employers would

have conveyed that adequate warning to him had it been provided on the defendants' products' packaging must be submitted to the jury, along with whether the warnings were adequate in their substance and prominence."); *Sorto-Romero*, 2007 WL 2816191, at \*12 (noting that where employer communicated the proper use of the shaper to his employees a "jury could find that the information on an adequately labeled shaper that instructed users not to use the shaper without the spindle guard would have been communicated to Plaintiff by his Spanish-speaking co-workers, and that failure to provide such a warning could be seen as a proximate cause of Plaintiff's injuries."); *but see Mustafa*, 2007 WL 959704 at \*19 (recognizing viability of third-party conveyance theory but concluding, based upon specific facts, that application of theory was not viable since plaintiff only spoke Albanian and there was no evidence that anyone could have actually conveyed the warning to plaintiff).

Where a products liability claim is premised upon a failure to warn, a plaintiff may factually support his claims without utilizing expert testimony. *See Billiar v. Minnesota Min. & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980) ("Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment considering all the circumstances."); *Sorto-Romero*, 2007 WL 2816191 at \*12 ("A jury may assess the adequacy of a warning, even in the absence of expert testimony."); *Quiles v. Bradford-White Corp.*, No. 10-CV-747, 2012 WL 1355262, at \*9 (N.D.N.Y. Apr. 18, 2012) ) ("Expert testimony is not necessarily required to establish a failure to warn claim."); *Hunt v. CNH America LLC*, 2012 WL 777321, at \*22, n. 38 (W.D.N.Y. March 8, 2012). Thus, although the Court has precluded Stanley Fein's expert testimony, *see* section III.A.3. *supra*, this fact will not prevent the failure to warn claim from being considered by a jury, especially, where, as here, a material question of

fact exists concerning the sufficiency of the warning Lara received. Where "reasonable minds might disagree as to the extent of plaintiff's knowledge of the hazard," such a factual question is one for the jury. *Brady v. Dunlop Tire Corp.*, 275 A.D.2d 503, 711 N.Y.S.2d 633, 633 (App. Div. 2000) (internal citations omitted). In light of the applicable law on this issue, summary judgment as to this claim is DENIED.

### C. Breach of Implied Warranty

In order for a plaintiff to plead a claim based upon breach of an implied warranty, the following elements must be alleged: (1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect was the proximate cause of the injury. *Cavanagh v. Ford Motor Co.*, No. 13-CV-4584, 2014 WL 2048571, at *5 (E.D.N.Y. May 19, 2014).

"Under New York Law, section 2-725 of the Uniform Commercial Code ("UCC") governs Plaintiff's cause of action for breach of implied warranty for the sale of goods." *Barban*, 2005 WL 387660, at *10; *see Delehanty*, 663 F. Supp. 2d at 134; *Chase Manhattan Bank, N.A. v. T & N plc*, 905 F. Supp. 107, 112 (S.D.N.Y. 1995); *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 410, 488 N.Y.S.2d 132, 133, 477 N.E.2d 434, 435 (1985). Section 2–725 of the UCC requires that a plaintiff bring a claim for breach of warranty within four years after the cause of action accrued. *See Barban*, 2005 WL 387660, at *10; *see Delehanty*, 663 F. Supp. 2d at 134; *Vanata v. Delta Int'l Mach. Corp.*, 269 A.D.2d 175, 176, 702 N.Y.S.2d 293, 295 (2000) ("under UCC § 2–725, an action for breach of implied warranty must be commenced within four years from the date that the defendant tenders delivery of the product"). A cause of action for breach of implied warranty accrues upon delivery of the product to the initial

purchaser. *See Solorio v. Asplundh Tree Expert Co.*, No. 02–CV8035, 2009 WL 755362, at *5

(S.D.N.Y. Mar. 23, 2009) (citing *Schrader v. Sunnyside Corp.*, 297 A.D.2d 369, 747 N.Y.S.2d

26 (App. Div. 2002)); *Hu v. Tishman Speyer Silverstein P'ship*, No. 97 CIV. 2356, 2000 WL

1277336, at *4 (S.D.N.Y. Sept. 8, 2000) ("a cause of action against a manufacturer or distributor

accrues on the date the party charged tenders delivery of the product, not on the date that some

third party sells it to [the] plaintiff.") (internal citation omitted). Such accrual is deemed to have

occurred despite the aggrieved party's lack of knowledge of the breach. *Vanata*, 269 A.D.2d at

176, 702 N.Y.S.2d at 295 (citing UCC § 2–725 (2)). In addition, this rule is equally applicable to

suits by a party who is not in privity with the manufacturer. *Heller v. U.S. Suzuki Motor Corp.*,

64 N.Y.2d 407, 411, 488 N.Y.S.2d 132, 133, 477 N.E.2d 434, 435 (1985); *Vanata*, 269 A.D.2d

at 176, 702 N.Y.S.2d at 295.

    In the instant case, the Delta Unisaw was acquired second-hand by Artplak in 2008 or

2009 from a business called American Visual Display. *See* Martin Decl., Ex. G at 9, 11. This

action was filed in New York State Supreme Court on October 16, 2013. *See* DE 1 (Notice of

Removal). Even assuming that Artplak took possession of the saw at some point from

October 16, 2009 through December 2009 — theoretically enabling Plaintiffs to meet the four-

year statute of limitations — Artplak was not the saw's original purchaser. *See Solorio*, 2009

WL 755362, at *5 (noting that cause of action for breach of implied warranty accrues upon

delivery of the product to the initial purchaser); *see also Hu*, 2000 WL 1277336, at *4. It

therefore follows that the original purchaser of the saw, whether that was American Visual

Display or some other entity, had to have taken delivery more than four years prior to the

institution of this action. Since any such claim accrues only upon delivery of the product to the

41

initial purchaser, Plaintiffs' breach of implied warranty claim falls outside of the statute of limitations period and is thus time-barred.  *See Delehanty*, 663 F. Supp. 2d at 134; *Gelber v. Stryker Corp.*, 788 F. Supp. 2d 145, 166 (S.D.N.Y. 2011) (dismissing breach of implied warranty claim because claim was not filed within four years of accrual); *Hu*, 2000 WL 1277336, at *4 (same).[7]

### D.  Abandoned Claims

As to their claims for:  (1) breach of express warranty; (2) strict liability based upon an alleged manufacturing defect; and (3) loss of services, *see* Compl. ¶¶ 47-54, 63, 70-71, Plaintiffs have failed to address these claims in their opposition to Defendant's motion for summary judgment and therefore such claims are deemed abandoned.  *See Hardy v. City of New York*, 732 F. Supp. 2d 112, 125 (E.D.N.Y. 2010) ("Federal courts have the discretion to deem a claim abandoned "when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (internal quotations and citation omitted); *Lipton v. Cty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); *Mattison v. Potter*, 515 F. Supp. 2d 356, 370 (W.D.N.Y. 2007) (recognizing that where opposing party fails to address arguments put forth in motion for summary judgment as to certain claims, then such claims may be found to be abandoned); *Taylor v. City of New York,* 269 F. Supp. 2d 68, 75

---

[7]      Although Plaintiffs' breach of warranty claim is time-barred and thus fails as a matter of law, the Court is compelled to point out that Defendant has mis-stated the law in its brief concerning alternative grounds for dismissal.  Specifically, Defendant asserts that "the evolution of strict products liability doctrine in New York has rendered a breach of warranty cause of action superfluous with plaintiffs' strict liability claim."  Def's. Mem. at 25 (citing *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 411, 488 N.Y.S.2d 132 (1985)).  However, in the 30 years since *Heller* was decided, the law has evolved, and, at present, New York law provides that a breach of implied warranty action has "*not* been subsumed by the tort cause of action for strict products liability."  *Derienzo*, 376 F. Supp. 2d at 570 (emphasis added); *see Castro v. QVC Network, Inc.*, 139 F.3d 114, 117–18 (2d Cir. 1998); *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 256, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

(E.D.N.Y. 2003); *Dineen v. Stramka,* 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (holding that plaintiff's failure to address claims in papers filed in opposition to summary judgment "enabl[es] the Court to conclude that [plaintiff] abandoned them"); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y.1998) (holding where defendant's summary judgment papers specifically address employment discrimination claims raised in complaint, and plaintiff's opposition papers fail to respond to such arguments, court may deem all such claims abandoned and grant summary judgment as to such claims); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n. 11 (S.D.N.Y. 1997) (dismissing with prejudice on summary judgment motion claim for which plaintiff failed to provide any argument in opposition to defendant's motion), *aff'd*, 130 F.3d 1101 (2d Cir.1997).

In light of the foregoing applicable case law, Plaintiffs' claims for breach of express warranty, strict liability based upon an alleged manufacturing defect, and loss of services are deemed abandoned.

## V.    CONCLUSION

For the foregoing reasons, the Court hereby:  (1) GRANTS Defendant's motion to preclude Plaintiffs' expert; and (2) GRANTS, in part, and DENIES, in part, Defendant's motion for summary judgment.


Dated:   Central Islip, New York
             March 31, 2016

**SO ORDERED.**

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge